# Exhibit A

<div align="right">**EXECUTION VERSION**</div>

## Asset Purchase Agreement

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made on October 28, 2014 among As Seen on TV, Inc., a Florida corporation, with its principal place of business at 14044 Icot Blvd., Clearwater, Florida ("ASTV"), TV Goods, Inc., a Florida corporation, within its principal place of business at 14044 Icot Blvd., Clearwater, Florida ("TV Goods" and, together with ASTV, the "Sellers" and each a "Seller"), and Telebrands Corp., a New Jersey corporation, with its principal place of business at 79 Two Bridges Road, Fairfield, NJ 07004 (the "Buyer").

IN CONSIDERATION of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1. Purchase of Assets.**

At the Closing, the Sellers shall sell, transfer and assign to Buyer, and Buyer shall purchase from the Sellers, on the terms set forth in this Agreement, all of the Sellers' respective rights, title and interest in and to the assets set forth on Schedule 1 hereto (the "Property"), free and clear of any Liens (as defined below). "Lien" shall mean any security interest, pledge, charge, hypothecation, mortgage, lien, encumbrance, claim or cause of action.

Other than those liabilities arising under the Assumed Agreement (as defined below) after the Closing, the Buyer shall not assume any liabilities or obligations of the Sellers or their respective individual shareholders, directors, officers, affiliates, creditors, parent or subsidiary companies, of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created (the "Excluded Liabilities").

**2. Purchase Price.**

a.      Purchase Price. Upon the terms and subject to the conditions contained in this Agreement, as consideration for the sale, transfer and assignment of the Property and in full payment therefor, the Buyer shall pay to the Sellers $3,000,000.00 (the "Purchase Price"), which shall be payable on the Closing Date in cash in immediately available funds by wire transfer to an account designated by the Sellers at least one (1) business day prior to Closing.

b.      Allocation of Purchase Price.   The Sellers and the Buyer agree to allocate the Purchase Price among the Property for all purposes (including tax and financial accounting) in accordance with Schedule 2.b. hereof. The Sellers and the Buyer shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

c.      Withholding Tax.   The Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that the Buyer may be required to deduct and withhold under any

applicable tax law, which have been identified and agreed to by Seller prior to Closing. All such withheld amounts shall be treated as delivered to the Sellers hereunder.

**3. Assumption of Contract and Royalty Payment.**

As of the Closing, the Buyer will assume all of the Sellers' respective rights, interests and obligations under that certain E-Commerce Joint Venture Partnership agreement by and between TV Goods and Delivery Agent, Inc. ("Delivery Agent") dated May 27, 2011, as amended as of July 19, 2011 and August 27, 2012 (the "Assumed Agreement"). Notwithstanding anything to the contrary set forth herein, the Sellers shall retain any revenue share payments payable by Delivery Agent pursuant to Section 10 of the Assumed Agreement with respect to product sales made during the period commencing on October 1, 2014 and ending on December 31, 2014 (the "Fourth Quarter Period"); provided, however, that if such revenue share payments attributable to the Fourth Quarter Period shall exceed $200,000 in the aggregate, the Sellers shall pay to the Buyer promptly upon receipt thereof, any and all of such excess. For the avoidance of doubt, the Buyer shall have no obligation to pay to the Sellers with respect to any shortfall or amounts owed by Delivery Agent to the Sellers other than as provided above, and all revenue share payments payable by Delivery Agent under the Assumed Agreement with respect to any periods after the Fourth Quarter Period shall be payable directly to the Buyer.

**4. Closing.**

a.     Closing Date.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the date hereof (the "Closing Date").

b.     Closing Deliveries.

    i.     At the Closing, the Buyer shall pay an amount equal to the Purchase Price in accordance with this Agreement and shall deliver to the Sellers the Transaction Documents (as defined below) duly executed by the Buyer.

    ii.     At the Closing, the Sellers shall deliver to Buyer (A) the Property; (B) Transaction Documents duly executed by the Seller party thereto; and (C) all consents and waivers set forth on Schedule 4.b.ii attached hereto.

    iii.     "Transaction Documents" shall mean (A) an assignment and assumption agreement in the form of Exhibit A hereto, effecting the assignment to and assumption by the Buyer of the Assumed Agreement; and (B) an intellectual property assignment in the form of Exhibit B hereto, transferring all of the Sellers' respective rights, title and interests in and to the intellectual property and the domain name registrations included in the Property to Buyer.

2

**5. Representations by the Sellers.**

As an inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated herein, the Sellers, jointly and severally, represent and warrant to the Buyer, as of the date of this Agreement as follows:

a.      The Sellers are the sole and exclusive owners of, and have good and marketable title to, the Property, free and clear of any Liens, with full right to sell or dispose of it as the Sellers may choose, and no other person or entity has any claim, right, title, interest, or Lien in, to, or on the Property. The Sellers have the valid right to use, possess, reproduce, make or have made, modify, display, market, perform, publish, transmit, broadcast, sell, license, sublicense, distribute or otherwise exploit (collectively "Exploit" or "Exploitation") all of the Property.  No third party has made any claim or assertion challenging the Sellers' sole and exclusive ownership of all right, title and interest in and to the Property.

b.      The Sellers have no undischarged obligations affecting the Property, other than as disclosed in Schedule 5.b.

c.      There are no Liens against the Property and, other than the Assumed Agreement, the Property is not the subject of any license.

d.      Consents. No consent from or other approval or authorization of any governmental entity, board of directors, or any other person is necessary in connection with the execution of this Agreement or the Transaction Documents, or the consummation of the transactions contemplated hereby and thereby, other than the consent of the Boards of Directors of the Sellers.

e.      Property. The Property is merchantable and fit for its intended use and is free of any material defects in workmanship.  The Property is sufficient for the conduct of Sellers' business on the www.asseenontv.com website (the "Site") as currently conducted and as currently proposed to be conducted.  Other than the Assumed Agreement, there are no other contracts or agreements governing or relating to the Property.  Other than as set forth in the Assumed Agreement, no assets necessary for or related to the conduct of business relating to the Property are owned or used by any individual or entity other than the Sellers. No royalties, commissions, fees or other payments are or shall become payable by the Sellers to any third party by reason of the Exploitation of any of the Property in the conduct of the Sellers' business on the Site as currently conducted and as currently proposed to be conducted.

f.      Payment of Taxes. The Sellers and their respective subsidiaries have (i) filed all tax returns for the periods prior to and including the Closing Date, and (ii) paid, or will arrange for the full payment of, all taxes owed by the Sellers with respect to the Property with respect to all periods prior to and including the Closing Date.

g.     Insurance. At the time of signing this Agreement, the Sellers will provide the Buyer with a copy of the most current insurance policy, if any, covering the Property.

h.     Licenses, Permits and Consents. There are no licenses or permits currently required by the Sellers for the consummation of the transactions contemplated by this Agreement or the Transaction Documents.

i.     Litigation. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of the Sellers, threatened against or involving any of the Sellers or brought by any Seller or affecting any of the Property at law or in equity or admiralty or before or by any federal, state, municipal, or other governmental department, commission, board, agency, or instrumentality, domestic or foreign, nor has any such action, suit, proceeding, or investigation been pending during the 24-month period preceding the date hereof. The Sellers are not operating its business under or subject to, or in default with respect to, any order, writ, injunction, or decree of any court of federal, state, municipal, or governmental department, commission, board, agency, or instrumentality, domestic or foreign.

j.     Compliance with Laws. The Sellers are not in violation of any laws, regulations, and orders applicable to the Property or the transactions contemplated by this Agreement, and the present uses by the Sellers of the Property do not violate any such laws, regulations, and orders. The Sellers have no knowledge of any material present or future expenditures that will be required with respect to the Property to achieve compliance with any present statute, law, or regulation, including those relating to the environment or occupational health and safety.

k.     Organization and Good Standing. Each Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida, with full corporate power and authority to conduct it business as it is presently being conducted and to own and use the Property.

l.     Authority. Each Seller has all requisite corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement and the Transaction Documents and to perform its obligations hereunder and thereunder. The execution and delivery by each Seller of this Agreement and the Transaction Documents, and the consummation by the Sellers of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Board of Directors of each Seller. No other corporate proceedings on the part of any Seller, including the consent or approval of the stockholders of each Seller, are necessary to authorize this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby. This Agreement and the Transaction Documents have been duly executed and delivered by the Sellers and are the legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting or relating to creditors' rights generally, and is subject to general principles of equity.

4

m.      Non-Contravention.  The execution, delivery and performance by each Seller of this Agreement and the Transaction Documents does not and will not (i) contravene or conflict with such Seller's certificate of incorporation or bylaws or any resolution adopted by the Board of Directors of such Seller; (ii) contravene or conflict with or constitute a violation of any provision of any applicable law binding upon the Sellers or the Property; (iii) result in the creation or imposition of any Lien on any of the Property; or (iv) contravene, conflict with or constitute a violation or breach of any agreement to which such Seller is a party.

n.      Financial Information.  The financial information of the Sellers provided to the Buyer, comprised of the spreadsheets attached as Exhibit C hereto, is true and accurate business records of the Sellers, and, to the best of the Sellers' knowledge, contain true and accurate information regarding the Sellers' business relating to the Property.

o.      Seller IP Registrations.  All registrations and applications made by or on behalf of the Sellers for the Property in any jurisdiction for any patents, copyrights, mask works, trademarks, service marks, design rights, domain names are set forth on Schedule 1 ("Seller IP Registrations").  All of the Seller IP Registrations are valid, enforceable and subsisting.  Other than as described on Schedule 5.o. hereto, to the best of Sellers' knowlege, there are no actions that must be taken by the Sellers or Buyer within ninety (90) days after the date of this Agreement for the purpose of obtaining, maintaining, perfecting, preserving or renewing any Seller IP Registration. Schedule 1 also sets forth all trademarks, trade names, service marks, logos, domain names, design rights or other identifiers currently or previously used by the Sellers on the Site but for which no registration has been sought.

p.      Infringement.  To the best of Sellers' knowledge, the Exploitation of the Property (i) does not and shall not conflict with, infringe, violate or interfere with or misappropriate any right (including any intellectual property right), title or interest of any third party and (ii) does not and shall not constitute unfair competition or unfair trade practices under any laws to which the Sellers are subject.  There is no pending or, to the knowledge of the Sellers, threatened claim that any of the Property is invalid or contesting the ownership or right of the Sellers to Exploit any of Property, nor is there any basis for any such claim. The Sellers have not received any, and, to the knowledge of the Sellers, there are no, claims, notices or complaints regarding the Sellers' information practices or the disclosure, retention or misuse of any personal information.

q.      Disclosure. No representation or warranty by the Sellers contained in this Agreement, and no statement contained in any certificate or other instrument furnished or to be furnished to Buyer pursuant hereto, or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact that is necessary in order to make the statements contained therein not misleading.

5

**6. Representations by Buyer.**

As an inducement to the Sellers to enter into this Agreement and to consummate the transactions contemplated herein, the Buyer represents and warrants to the Sellers, as of the date of this Agreement as follows:

a.     Consents. No consent from or other approval or authorization of any governmental entity, board of directors, or any other person is necessary in connection with the execution of this Agreement or the Transaction Documents, or the consummation of the transactions contemplated hereby and thereby, other than the consent of the Board of Directors of the Buyer.

b.     Licenses, Permits and Consents. There are no licenses or permits currently required by the Buyer for the consummation of the transactions contemplated by this Agreement or the Transaction Documents.

c.     Organization and Good Standing. The Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New Jersey, with full corporate power and authority to conduct it business as it is presently being conducted and to own and use the Property.

d.     Authority. The Buyer has all requisite corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement and the Transaction Documents and to perform its obligations hereunder and thereunder. The execution and delivery by the Buyer of this Agreement and the Transaction Documents, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Board of Directors of the Buyer. No other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby. This Agreement and the Transaction Documents have been duly executed and delivered by the Buyer and are the legal, valid and binding obligations of the Buyer enforceable against Buyer in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting or relating to creditors' rights generally, and is subject to general principles of equity.

e.     Non-Contravention. The execution, delivery and performance by the Buyer of this Agreement and the Transaction Documents does not and will not (i) contravene or conflict with the Buyer's certificate of incorporation or bylaws or any resolution adopted by the Board of Directors of the Buyer; (ii) contravene or conflict with or constitute a violation of any provision of any applicable law binding upon the Buyer; or (iii) contravene, conflict with or constitute a violation or breach of any agreement to which the Buyer is a party.

f.     Disclosure. No representation or warranty by the Buyer contained in this Agreement, and no statement contained in any certificate or other instrument furnished or

6

to be furnished to Buyer pursuant hereto, or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact that is necessary in order to make the statements contained therein not misleading.

## 7. Covenants.

a.     All Property enumerated in Exhibit A shall, upon consummation of this Agreement, be transferred by the Sellers to the Buyer free and clear of all Liens.

b.     The Sellers shall assume all risk of loss, damage, or destruction to the Property subject to this Agreement until the Closing.

c.     The Sellers and the Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement on a timely basis the transactions contemplated by this Agreement and the Transaction Documents.

d.     Unless otherwise required by applicable law, neither party hereto shall make any public announcements regarding this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).  It is understood by the parties hereto that the Property constitutes a material portion of the Sellers' assets, and as such certain disclosures will be required by applicable law; provided, however, that the Sellers shall provide the Buyer a reasonable opportunity to review such disclosure before it is publicly disseminated or filed with the Securities and Exchange Commission, and the Sellers shall give due consideration to the reasonable additions, deletions and other changes suggested thereto by the Buyer.

e.     Bulk Sales Laws.  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Property to Buyer.

f.     All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction Documents and the documents to be delivered hereunder shall be borne and paid by Sellers when due. The Sellers shall, at their own expense, timely file any tax return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

g.     Release of Security Interests.  The Sellers hereby authorize the Buyer to prepare and file any and all UCC financing statement amendments with respect to all UCC financing statements which include liens on any or all of the Property naming any Seller as debtor that are currently filed of record in order to effectuate the release by any creditor of its security interests and liens upon the Property.

7

## 8. Indemnification

a.      Sellers' Agreement to Indemnify.  The Sellers shall, jointly and severally, indemnify and hold harmless the Buyer and its affiliates, directors, managers, stockholders, officers, employees, customers, suppliers, attorneys, agents, representatives, successors and permitted assigns (collectively, the "Buyer Indemnitees") in respect of any and all losses, liabilities, claims, damages or expenses (collectively, "Damages") reasonably incurred by any Buyer Indemnitee in connection with, or resulting from, any or all of (i) any breach of any representation or warranty made by any Seller in this Agreement or the Transaction Documents; (ii) any breach in the performance of any covenant, agreement or obligation of any Seller contained in this Agreement or the Transaction Documents; (iii) any Excluded Liabilities; and (iv) any liabilities relating to the Property arising prior to the Closing Date.

b.      Buyer's Agreement to Indemnify.  The Buyer shall indemnify and hold harmless each Seller and their respective affiliates, directors, managers, stockholders, officers, employees, customers, suppliers, attorneys, agents, representatives, successors and permitted assigns (collectively, the "Seller Indemnitees") in respect of any and all Damages reasonably incurred by any Seller Indemnitee in connection with, or resulting from, any or all of (i) any breach of any representation or warranty made by the Buyer in this Agreement or the Transaction Documents; (ii) any breach in the performance of any covenant, agreement or obligation of the Buyer contained in this Agreement or the Transaction Documents; and (iii) any liabilities relating to the Property arising on or after the Closing Date.

c.      Survival of Representations, Warranties and Covenants.  All representations, warranties, covenants, agreements and obligations of each party hereto contained in this Agreement and the Transaction Documents and all claims of any Buyer Indemnitee or Seller Indemnitee in respect of any breach of any such representation, warranty, covenant, agreement or obligation, shall survive the execution of this Agreement, and shall expire 30 days after the expiration of all applicable statutes of limitations, including extensions thereof.

## 9. Schedules.

Schedules and other documents attached or referred to in this Agreement are an integral part of this Agreement.

## 10. Entire Agreement.

This Agreement and the Transaction Documents constitute the sole and entire agreement between Buyer and the Sellers with respect to the transactions contemplated hereby and thereby, and supersedes any prior agreements, whether written or oral with respect thereto. Any additional agreements or representations with respect to the transactions contemplated by this Agreement or the Transaction Documents are null and void, unless

8

otherwise required by law. Both parties agree to waive rights as to any conflicting laws which may nullify this Agreement to the full extent allowable by law.

**11. Jurisdiction; Waiver of Jury Trial**.

a.      Jurisdiction.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby shall be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York in the Borough of Manhattan, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  Each of the Buyer and the Sellers hereby (i) waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or any of the other Transaction Documents or the subject matter hereof and thereof may not be enforced in or by such court, and (ii) agrees to commence any such action only before one of the above-named courts.

b.      Waiver of Jury Trial.  Each party hereto acknowledges and agrees that any controversy which may arise under this Agreement or the Transaction Documents is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby.

**12. Costs and Expenses.**

Except as expressly provided to the contrary in this Agreement, each party shall pay all of its own costs and expenses incurred with respect to the negotiation, execution and delivery of this Agreement and the exhibits hereto.

**13. Miscellaneous Provisions.**

a.      Applicable Law. This Agreement shall be construed under and in accordance with the laws of the State of New York, without regard to the conflict of law rules thereof.

b.      Parties Bound. This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, legal representatives, successors and assigns as permitted by this Agreement.

*NY 244766039v5*

c.     No Third-party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

d.     Legal Construction. This Agreement shall be construed as to effectuate the intended purpose of the Agreement. In the event any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, this Agreement shall be modified to otherwise effectuate the sale under the original intentions of the Parties. This may include striking the invalid, illegal, or unenforceable provision as if they had never been contained in this Agreement, or modifying the invalid, illegal or unenforceable provisions to make them compliant without modifying the original purpose of the Parties.

d.     Amendments. This Agreement may be amended only by a written agreement duly executed by all parties hereto.

e.     Notice.  All notices, requests aud other communications to either party hereunder shall be in writing (including facsimile, PDF or e-mail) and shall be addressed to the applicable party at the address set forth in the introduction to this Agreement or as otherwise provided by such party in writing.

f.     Specific Performance.  The parties agree that irreparable damage would occur if any provision of this Agreement or any of the Transaction Documents were not performed in accordance with the terms hereof and thereof and that the parties shall be entitled to specific performance of the terms hereof and thereof, in addition to any other remedy to which they are entitled at law or in equity.

g.     Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an origiual, with the same effect as if the signatures thereto were upon the same instrument.

**[Signature Page Follows.]**

10

2.

**IN WITNESS WHEREOF,** the parties hereto caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

**Sellers:**

As Seen on TV, Inc.

By: _____   Date: 10/28/14
Name:  Robert DeCecco
Title:   Chief Executive Officer

TV Goods, Inc.

By: _____   Date: 10/28/14
Name:  Robert DeCecco
Title:   Chief Executive Officer

**Buyer:**

Telebrands Corp.

By: _____   Date: 10/28/2014
Name:  Bala Iyer
Title:   Executive Vice President

[*Signature Page to Asset Purchase Agreement*]

**Schedule 1**

### 1. Domain Names

| ASSEENONTV.COM | |
|---|---|
| ASSEENONTV.COFFEE | ASSEENONTVKIDS.US |
| ASSEENONTV.EQUIPMENT | ASSEENONTVLIVE.NET |
| ASSEENONTV.HOUSE | ASSEENONTVLIVE.TV |
| ASSEENONTV.TIPS | ASSEENONTVMD.COM |
| ASSEENONTV.ZONE | ASSEENONTVO.COM |
| 0ASSEENONTV.COM | ASSEENONTVPHONECARDS.COM |
| 1-800SEENONTV.COM | ASSEENONTVSHOPPINGCHANNEL.COM |
| 1800ASSEENONTV.COM | ASSEENONV.COM |
| 1800ASSEENONTV.ME | ASSEENONVT.COM |
| 2ASSEENONTV.NET | ASSEENONYV.COM |
| 866-ASSEENONTV.COM | ASSEENONZTV.COM |
| 866-ASSEENONTV.NET | ASSEENOTNV.COM |
| 866ASSEENONTV.COM | ASSEENOTTV.COM |
| 866ASSEENONTV.NET | ASSEENOTVWHOLESALE.COM |
| AS-SEEN-ON-TV-OFFERS.COM | ASSEEONNTV.COM |
| AS-SEENONTV.COM | ASSEESONTV.COM |
| ASAEENONTV.COM | ASSESENONTV.COM |
| ASASEENONTV.COM | ASSHEENONTV.COM |
| ASCEENONTV.COM | ATSEENONTV.COM |
| ASEEENONTV.COM | EENONTV.NET |
| ASEENONTV.CO | ISSEENONTV.COM |
| ASEENONTV.INFO | MASSEENONTV.COM |
| ASEENONTV.ORG | NAPKINMILLIONAIRESYSTEM.COM |
| ASSEENANTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.COM |
| ASSEENIONTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.NET |
| ASSEENONATV.COM | OFFICIALASSEENONTVDIRECT.COM |
| ASSEENONITV.COM | OFFICIALASSEENONTVDIRECT.NET |
| ASSEENONT-V.COM | OFFICIALASSEENONTVDIRECTSCAM.COM |
| ASSEENONTB.COM | OFFICIALASSEENONTVDIRECTSCAM.NET |
| ASSEENONTCV.COM | POWERED-BY-ASSEENONTV.COM |
| ASSEENONTOV.COM | POWERED-BY-ASSEENONTV.INFO |
| ASSEENONTV-ADULTS.COM | POWERED-BY-ASSEENONTV.NET |
| ASSEENONTV-ADULTS.NET | POWERED-BY-SEENONTV.COM |
| ASSEENONTV-ADULTS.US | POWERED-BY-SEENONTV.INFO |
| ASSEENONTV-DEALS.COM | POWERED-BY-SEENONTV.NET |
| ASSEENONTV-DIRECT.COM | POWEREDBYASSEENONTV.COM |
| ASSEENONTV-DIRECT.NET | POWEREDBYASSEENONTV.INFO |
| ASSEENONTV-GUY.COM | POWEREDBYASSEENONTV.NET |
| ASSEENONTV-GUYS.COM | POWEREDBYSEENONTV.COM |
| ASSEENONTV-INC.COM | POWEREDBYSEENONTV.INFO |
| ASSEENONTV-INC.NET | SEEENONTV.COM |
| ASSEENONTV-INFO.COM | SEENONTV-INC.COM |
| ASSEENONTV-KIDS.COM | SEENONTVGUYS.COM |
| ASSEENONTV-KIDS.NET | SEENONTVPC.INFO |

| | |
|---|---|
| ASSEENONTV-KIDS.US | SEENONTVSUPERSTORE.COM |
| ASSEENONTV-OFFERS.INFO | SEENONTVWHOLESALER.COM |
| ASSEENONTV-OFFERS.NET | SENNONTV.COM |
| ASSEENONTV-OFFERS.ORG | SENONTV.COM |
| ASSEENONTV-PC.COM | SSEENONTV.COM |
| ASSEENONTV-WHOLESALER.COM | THEASEENONTVDIRECT.COM |
| ASSEENONTV1.NET | THEASEENONTVDIRECT.NET |
| ASSEENONTVADULT.TV | THEASEENONTVDIRECTRIPOFF.COM |
| ASSEENONTVADULTS.COM | THEASEENONTVDIRECTRIPOFF.NET |
| ASSEENONTVADULTS.NET | THEASSEENONTVDIRECT.COM |
| ASSEENONTVADULTS.TV | THEASSEENONTVDIRECT.NET |
| ASSEENONTVADULTS.US | THEASSEENONTVDIRECTSCAM.COM |
| ASSEENONTVAMBASSADOR.COM | THEASSEENONTVDIRECTSCAM.NET |
| ASSEENONTVCALLINGCARDS.COM | THEOFFICIALASSEENONTV.CO.UK |
| ASSEENONTVDEAL.COM | THEOFFICIALASSEENONTV.COM |
| ASSEENONTVDIRECTSCAM.COM | THEOFFICIALASSEENONTVDIRECT.COM |
| ASSEENONTVDIRECTSCAM.NET | THEOFFICIALASSEENONTVDIRECT.NET |
| ASSEENONTVE.COM | TVGOODSINC.CO |
| ASSEENONTVGOODS.COM | TVGOODSINC.COM |
| ASSEENONTVGOODS.NET | TVGOODSINC.NET |
| ASSEENONTVINFO.COM | USEENONTV.COM |
| ASSEENONTVKIDS.NET | USSEENONTV.COM |
| ASSEENONTVKIDS.TV | WWWSEENONTV.COM |
| | YOUWILLNOTBESEENONTV.COM |

## 2. Trademarks

- ASSEENONTV.COM



- 

- 1 (866) ASSEENONTV

## 3. Phone Number

- The phone number (866) 277-3366.

## 4. Agreement

- E-Commerce Joint Venture Partnership agreement by and between TV Goods, Inc. and Delivery Agent, Inc. ("Delivery Agent") dated May 27, 2011, as amended as of July 19, 2011 and August 27, 2012.

### 5. Customer/Marketing Information

- Any and all customer and marketing information owned or used by the Sellers arising pursuant to or in connection with the E-Commerce Joint Venture Partnership agreement by and between TV Goods and Delivery Agent, Inc. dated May 27, 2011, as amended as of July 19, 2011 and August 27, 2012.

**Schedule 2.b.**

**Tax Allocation**

100% of the Purchase Price shall be allocated to the Domain Name.

**Schedule 4.b.ii.**

1. Written consent and resolution of the Board of Directors of each Seller approving the execution, delivery and performance of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby.

2. Waiver by Delivery Agent, Inc. of its right of first refusal to purchase the domain name "www.asseenontv.com" nnder the Assnmed Agreement.

3. Release of Lien on the domain name "www.asseenontv.com" granted to MIG7 Infusion, LLC ("MIG7") pursuant to that certain Security Agreement, by and among ASTV, MIG 7 and the other parties thereto, dated as of April 3, 2014.

4. Release of Lien on the domain name "www.asseenontv.com" granted to Vicis Capital Master Fund pursuant to that certain Third Amended and Restated Security Agreement, by and between Infusion Brands International, Inc. and Vicis Capital Master Fund, dated as of March 6, 2014.

## Schedule 5.b.

None.

**Schedule 5.o.**

1. Provide access to Email accounts (Hosted via Google Apps) and assign administrative rights to Telebrands tech contact.

2. Registration for the following domains will need to be renewed within 90 calendar days following the Closing Date.

| Domain Name | Renewal Deadline |
| --- | --- |
| AS-SEENONTV.COM | 12/18/2014 |
| ASAEENONTV.COM | 12/13/2014 |
| ASEENONTV.INFO | 12/17/2014 |
| ASEENONTV.ORG | 12/17/2014 |
| ASSEENONTV-ADULTS.COM | 1/2/2015 |
| ASSEENONTV-ADULTS.NET | 1/2/2015 |
| ASSEENONTV-ADULTS.US | 1/1/2015 |
| ASSEENONTV-KIDS.COM | 12/30/2014 |
| ASSEENONTV-KIDS.NET | 12/30/2014 |
| ASSEENONTV-KIDS.US | 12/29/2014 |
| ASSEENONTVADULTS.COM | 1/2/2015 |
| ASSEENONTVADULTS.NET | 1/2/2015 |
| ASSEENONTVADULTS.US | 1/1/2015 |
| ASSEENONTVDIRECTSCAM.COM | 1/21/2015 |
| ASSEENONTVDIRECTSCAM.NET | 1/21/2015 |
| ASSEENONTVKIDS.NET | 12/30/2014 |
| ASSEENONTVKIDS.US | 12/29/2014 |
| ASSEESONTV.COM | 1/8/2015 |
| OFFICIALASSEENONTVDIRETRIPOFF.COM | 1/21/2015 |
| OFFICIALASSEENONTVDIRECTRIPOFF.NET | 1/21/2015 |
| OFFICIALASSEENONTVDIRECT.COM | 1/21/2015 |
| OFFICIALASSEENONTVDIRECT.NET | 1/21/2015 |
| OFFICIALASSEENONTVDIRECTSCAM.COM/NET | 1/21/2015 |
| THEASSEENONTVDIRECT.COM/NET | 1/21/2015 |
| THEASSEENONTVDIRECTRIPOFF.COM/NET | 1/21/2015 |
| THEASSEENONTVDIRECT.COM/NET | 1/21/2015 |
| THEASSEENONTVDIRECTSCAM.COM/NET | 1/21/2015 |
| THEOFFICIALASSEENONTV.CO.UK | 12/28/2014 |
| THEOFFICIALASSEENONTV.COM | 12/28/2014 |
| THEOFFICIALASSEENONTVDIRECT.COM/NET | 1/21/2015 |

## EXHIBIT A

### ASSIGNMENT AND ASSUMPTION AGREEMENT

**EXHIBIT B**

**INTELLECTUAL PROPERTY ASSIGNMENT**

**EXHIBIT C**

**SELLER FINANCIAL INFORMATION**

| Date | DA Sales | OOD Sales | Total Revenue | DA Orders | OOD Orders | Total Orders | AOV | Visitors | Conversion | Earnings Per Visitor |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 (Full Year) | $3,913,279.00 | $407,803.93 | $4,321,082.93 | 112,397 | 9,692 | 122,089 | $35.40 | 6,241,195 | 1.96 | $1.58 |
| 2013 (Full Year) | $4,253,885.02 | $1,929,845.57 | $6,183,730.59 | 155,373 | 40,477 | 195,850 | $31.39 | 7,339,502 | 2.6 | $1.35 |
| 2012 (Jan-Jul) | $2,198,060.35 | $407,803.93 | $2,605,864.28 | 67,497 | 9,692 | 77,189 | $33.67 | 3,377,384 | 2.29 | $1.34 |
| 2013 (Jan-Jul) | $2,339,555.77 | $938,749.49 | $3,278,305.26 | 84,245 | 19,209 | 103,454 | $32.06 | 4,053,729 | 2.56 | $1.27 |
| 2014 (Jan-Jul) | $2,143,352.10 | $1,579,258.96 | $3,722,611.06 | 58,456 | 34,676 | 93,132 | $40.00 | 4,102,770 | 2.28 | $1.11 |

**Year Over Year Comparison**

| Date | DA Sales | OOD Sales | Total Revenue | DA Orders | OOD Orders | Total Orders | AOV | Visitors |
|---|---|---|---|---|---|---|---|---|
| 2014 vs 2012* | Down 2% | Up 74% | Up 29% | Down 15% | Up 72% | Up 17% | Up 15% | Up 17% |
| 2014 vs 2013* | Down 9% | Up 40% | Up 12% | Down 44% | Up 44% | Down 11% | Up 19% | Up 1% |

* 2014 Comparisons based on Jan-July 2012 and 2013 data

(2014 YTD sales are 12% higher than 2013, and 29% higher than 2012)



| Date | DA Sales | OOD Sales | Total Sales | DA Orders | OOD Orders | Total Orders | AOV | Visitors | Conversion | Earnings Per Visitor |
|---|---|---|---|---|---|---|---|---|---|---|
| 12-Jan | $330,740.87 | $152,114.28 | $482,855.15 | 9,953 | 3,161 | 13,114 | $36.82 | 608,826 | 2.15 | $1.28 |
| 12-Feb | $333,689.79 | $94,093.73 | $427,783.52 | 9,926 | 2,078 | 12,004 | $35.65 | 501,421 | 2.4 | $1.18 |
| 12-Mar | $337,729.59 | $69,995.28 | $407,724.87 | 10,638 | 1,881 | 12,519 | $32.56 | 473,873 | 2.65 | $1.17 |
| 12-Apr | $325,331.25 | $75,897.07 | $401,228.32 | 10,477 | 2,117 | 12,594 | $31.90 | 465,079 | 2.71 | $1.17 |
| 12-May | $314,412.76 | $15,703.57 | $330,116.33 | 9,262 | 455 | 9,717 | $34.13 | 442,851 | 2.19 | $1.37 |
| 12-Jun | $286,076.52 | $0.00 | $286,076.52 | 8,516 | 0 | 8,516 | $33.68 | 451,090 | 1.89 | $1.60 |
| 12-Jul | $270,079.57 | $0.00 | $270,079.57 | 8,725 | 0 | 8,725 | $31.05 | 434,444 | 2.02 | $1.62 |
| 12-Aug | $248,494.79 | $0.00 | $248,494.79 | 7,417 | 0 | 7,417 | $33.73 | 420,672 | 1.77 | $1.73 |
| 12-Sep | $207,846.00 | $0.00 | $207,846.00 | 5,709 | 0 | 5,709 | $36.51 | 480,696 | 1.19 | $2.37 |
| 12-Oct | $214,355.10 | $0.00 | $214,355.10 | 5,642 | 0 | 5,642 | $38.05 | 464,986 | 1.24 | $2.23 |
| 12-Nov | $372,984.90 | $0.00 | $372,984.90 | 8,874 | 0 | 8,874 | $42.19 | 640,719 | 1.36 | $1.82 |
| 12-Dec | $671,537.86 | $0.00 | $671,537.86 | 17,258 | 0 | 17,258 | $38.63 | 856,538 | 2.01 | $1.37 |
| 13-Jan | $455,452.37 | $12,986.93 | $468,439.30 | 13,347 | 263 | 13,610 | $34.71 | 685,046 | 1.97 | $1.49 |
| 13-Feb | $330,521.11 | $31,196.27 | $361,717.38 | 9,907 | 692 | 10,599 | $34.12 | 521,229 | 2.05 | $1.44 |
| 13-Mar | $314,863.46 | $71,940.14 | $386,803.60 | 9,917 | 1,545 | 11,462 | $33.77 | 536,080 | 2.15 | $1.41 |
| 13-Apr | $321,478.97 | $186,979.30 | $508,458.27 | 12,546 | 3,652 | 16,198 | $31.38 | 586,684 | 2.76 | $1.17 |
| 13-May | $302,433.74 | $210,702.21 | $513,135.95 | 12,437 | 4,157 | 16,594 | $30.95 | 568,421 | 2.92 | $1.12 |
| 13-Jun | $265,852.48 | $173,819.80 | $439,672.28 | 10,985 | 3,554 | 14,539 | $30.28 | 529,525 | 2.75 | $1.21 |
| 13-Jul | $348,953.64 | $251,124.84 | $600,078.48 | 15,106 | 5,346 | 20,452 | $29.36 | 626,744 | 3.26 | $1.05 |
| 13-Aug | $276,603.30 | $176,034.26 | $452,637.56 | 11,476 | 3,781 | 15,257 | $29.71 | 530,260 | 2.87 | $1.19 |
| 13-Sep | $250,324.09 | $125,726.20 | $376,050.29 | 9,778 | 2,731 | 12,509 | $30.25 | 499,309 | 2.49 | $1.36 |
| 13-Oct | $254,482.15 | $115,709.75 | $370,191.90 | 9,378 | 2,470 | 11,848 | $31.20 | 541,977 | 2.2 | $2.51 |
| 13-Nov | $411,798.08 | $181,646.23 | $593,444.31 | 14,350 | 3,725 | 18,075 | $32.81 | 718,297 | 2.5 | $1.24 |
| 13-Dec | $721,121.63 | $391,979.64 | $1,113,101.27 | 26,146 | 8,561 | 34,707 | $28.43 | 995,930 | 3.16 | $1.00 |
| 14-Jan | $288,098.09 | $259,963.02 | $548,061.11 | 8,116 | 6,198 | 14,314 | $38.34 | 698,887 | 2.05 | $1.30 |
| 14-Feb | $274,012.61 | $228,370.96 | $502,383.57 | 7,616 | 5,238 | 12,854 | $39.04 | 549,800 | 2.35 | $1.10 |
| 14-Mar | $309,865.87 | $254,170.37 | $564,036.24 | 8,349 | 5,590 | 13,939 | $40.41 | 589,200 | 2.36 | $1.06 |
| 14-Apr | $277,929.49 | $204,110.65 | $482,040.14 | 7,726 | 4,294 | 12,020 | $40.07 | 509,696 | 2.37 | $1.07 |
| 14-May | $360,029.45 | $190,599.48 | $550,628.93 | 9,255 | 3,773 | 13,028 | $42.24 | 560,469 | 2.33 | $1.03 |
| 14-Jun | $310,128.59 | $190,445.92 | $500,574.51 | 8,479 | 3,877 | 12,356 | $40.51 | 546,168 | 2.27 | $1.11 |
| 14-Jul | $323,288.00 | $251,598.56 | $574,886.56 | 8,915 | 5,706 | 14,621 | $39.33 | 648,550 | 2.26 | $1.13 |

EXECUTION COPY

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of October 28, 2014 (the "Effective Date") by and among TELEBRANDS CORP., a New Jersey corporation ("Acquiror"), and TV Goods, Inc., a Florida corporation ("Transferor").

WHEREAS, Transferor is party to that certain E-Commerce Joint Venture Partnership agreement by and between Transferor and Delivery Agent, Inc. ("Delivery Agent"), dated May 27, 2011, as amended as of July 19, 2011 and August 27, 2012 (the "Assumed Agreement");

WHEREAS, Acquiror and Transferor are parties to that certain Asset Purchase Agreement, dated the date hereof (the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the Asset Purchase Agreement, among other things, (i) Transferor has agreed to sell, transfer and assign to Acquiror the Assumed Agreement and all of Transferor's rights thereunder, and (ii) Acquiror has agreed to assume all of Transferor's liabilities and obligations thereunder.

NOW, THEREFORE, in consideration of the premises and the consideration hereinafter set forth, each of Acquiror and Transferor hereby agrees as follows:

1.    Defined Terms.  All terms set forth herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

2.    Assignment and Assumption.  Transferor hereby sells, transfers and assigns to Acquiror the Assumed Agreement and all of Transferor's rights thereunder, and Acquiror hereby assumes the Assumed Agreement and all of Transferor's liabilities and obligations thereunder, in each case, as specifically set forth in the Asset Purchase Agreement.  In addition, Transferor hereby warrants and agrees to defend the assignment of the Assumed Agreement unto Acquiror against the claims and demands of all third parties as set forth in the Asset Purchase Agreement.

3.    Further Assurances.  Transferor and Acquiror agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement on a timely basis the transactions contemplated by this Agreement.

4.    Representations and Warranties.  Notwithstanding the foregoing, no provision of this Agreement shall in any way modify, replace, amend, change, rescind, waive or in any way affect the express provisions (including the warranties, covenants, agreements, conditions, representations or any of the obligations and indemnifications, and the limitations relating thereto, of Acquiror or Transferor) set forth in the Asset Purchase Agreement, this Agreement being intended solely to effect the transfer of the Assumed Agreement pursuant to the Asset Purchase Agreement.

5.     Parties Bound. This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, legal representatives, successors and assigns as permitted by this Agreement.

6      No Third-party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.     Amendment.  This Agreement may be amended only by a written agreement duly executed by all parties hereto.

8.     Legal Construction.   This Agreement shall be construed as to effectuate the intended purpose of the Agreement. In the event any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, this Agreement shall be modified to otherwise effectuate the sale under the original intentions of the Parties. This may include striking the invalid, illegal, or unenforceable provision as if they had never been contained in this Agreement, or modifying the invalid, illegal or unenforceable provisions to make them compliant without modifying the original purpose of the Parties.

9.     Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon the same instrument.

10.    Applicable Law.  This Agreement shall be construed under and in accordance with the laws of the State of New York, without regard to the conflicts of law rules thereof.

**[Signature Page Follows.]**

NY 244767532v5

**IN WITNESS WHEREOF**, each of Acquiror and Transferor has executed and delivered this Agreement on the date first above written:

**ACQUIROR:**

TELEBRANDS CORP.

By: _____

Name: BALA DYER.

Title: EXECUTIVE VICE PRESIDENT.

**TRANSFEROR:**

TV GOODS, INC.

By: _____

Name: Robert DeLeeos

Title: CEO Director

*[Signature Page to Assignment and Assumption Agreement]*

## RELEASE OF SECURITY INTEREST AGREEMENT

This Release of Security Interest Agreement (this "Agreement") is made and entered into as of the 28ᵗʰ day of October, 2014, by and between AS SEEN ON TV, INC.,  Florida corporation ("ASTV") and MIG7 INFUSION LLC, a Florida limited liability company ("MIG7")

### WITNESSETH:

WHEREAS, ASTV and MIG7 are among the parties to that certain Senior Note Purchase Agreement dated as of April 3, 2014, as amended (the "NPA"), by and between ASTV, INFUSION BRANDS, INC., a Nevada corporation ("Infusion"), EDIETS.COM, INC., a Delaware corporation ("eDiets"), TV GOODS HOLDING CORPORATION, a Florida corporation ("TV Goods"), TRU HAIR, INC., a Florida corporation ("Tru Hair"), and RONCO FUNDING, LLC, a Delaware limited liability company ("RFL" and collectively with ASTV, Infusion, eDiets, TV Goods and Tru Hair, the "Credit Parties" and each individually, a "Credit Party"), and MIG7; and

WHEREAS, pursuant to the NPA, the Credit Parties issued to MIG7 that certain Senior Secured Promissory Note dated as of April 3, 2014, as amended (the "Note"); and

WHEREAS, to secure all present and future indebtedness, obligations and liabilities of the Credit Parties to MIG7 (including, without limitation, under the NPA and the Note), pursuant to that certain Security Agreement dated as of April 3, 2014, by and between the Credit Parties and MIG7 (the "Security Agreement"), ASTV granted to MIG7 a security interest in, inter alia, all of its right, title and interest in and to the tangible and intangible property listed on Schedule A hereto (all of which will hereafter collectively be referred to as the "Collateral"); and

WHEREAS, ASTV is a party to that certain Asset Purchase Agreement, dated of even date herewith, by and between Telebrands Corp. ("Telebrands") and ASTV (the "APA"), pursuant to which Telebrands will acquire from ASTV the Collateral; and

WHEREAS, in order to effectuate such a sale, the APA requires, and ASTV wishes to obtain from MIG7, a release of all of MIG7's rights, claims or interests of any sort, including any security interests, whether now existing or in the future, in or against any of the Collateral (the "Claims").

NOW, THEREFORE, for and in consideration of the foregoing, the mutual benefits to be received by the parties hereto, and the covenants and agreements contained herein, ASTV and MIG7 agree to the following:

1. Release of Creditor's Security Interests. In consideration of the increased liquidity provided to ASTV by the proceeds to be received from the APA, which MIG7 acknowledges is for a full, fair and valuable consideration to ASTV, and which liquidity may be instrumental in ASTV's ability to service and ultimately repay its obligations to MIG7, MIG7 hereby (a) releases and terminates its security interests in and liens upon the Collateral, (b) forever releases and discharges the Claims, regardless of (i) when its interest became perfected, (ii) when or how the Collateral was purchased, (iii) the value of the Collateral, (iv) the consideration given or promised therefore, or (v) the amount MIG7 is owed by the Credit Parties, and (c) authorizes ASTV or Telebrands to prepare and file any and all UCC financing statement amendments with respect to all UCC financing statements naming MIG7, as secured party, and ASTV, as debtor, that are currently filed of record in order to effectuate the release by MIG7 of its security interests and liens upon the Collateral.

MIG7 further (i) waives the obligations of ASTV with respect to the Collateral under the NPA, including without limitation Section 4.5(xiv) thereof; (ii) waives any Event of Default (as defined in the NPA and the Note) that would otherwise exist with respect to the sale of the Collateral under the APA, including without limitation as defined in Sections 6.1(ii) and 6.1(xii) of the NPA; and (iii) agrees to amend from this date forward the definition of "Collateral" as used in Section 2 of the Security Agreement to exclude the Collateral (as defined herein)

2. Reliance by ASTV; Specific Performance. This Agreement is an irrevocable release of any and all Claims to the Collateral, and MIG7 acknowledges that ASTV and Telebrands will rely upon the agreements of MIG7 herein as the basis for ASTV to provide certain representations, warranties and indemnifications to Telebrands in the APA. As such, damages will not be an effective remedy in the event of a breach of this Agreement by MIG7, and the parties therefore consent and agree to specific performance as the only effective remedy.

3. Amendment. This Agreement may not be amended except by written agreement executed by both ASTV and MIG7.

4. Captions. Captions as used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.

5. **GOVERNING LAW; JURY WAIVER. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA. THE PARTIES HERETO AGREE THAT PINELLAS COUNTY, FLORIDA WILL BE THE EXCLUSIVE VENUE FOR LITIGATION OF ANY DISPUTE OR CLAIM ARISING UNDER OR RELATED TO THIS AGREEMENT. THE PARTIES HERETO WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

6. Successors and Assigns. Unless otherwise herein provided, this Agreement shall be binding upon and inure to the benefit of all successors and assigns.

7. Entire Agreement. This Agreement constitutes the complete and integrated agreement of both ASTV and MIG7 with respect to the subject matter hereof, supersedes all prior or contemporaneous oral agreements, discussions or negotiations, and may not be orally modified or supplemented.

8. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which constitute but one agreement. Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date first above written.

**AS SEEN ON TV, INC.**

By: _____
Printed Name: Robert DeCecco
Title: Chief Executive Officer

**MIG7 INFUSION, LLC**

By:  Mallitz Invesment Group, LLC, as Manager

By: _____
Printed Name:  Craig A. Mallitz
Title: President

*NY 244774274v2*

Exhibit A

Collateral

## 1. Domain Names

| ASSEENONTV.COM | |
|---|---|
| ASSEENONTV.COFFEE | ASSEENONTVKIDS.US |
| ASSEENONTV.EQUIPMENT | ASSEENONTVLIVE.NET |
| ASSEENONTV.HOUSE | ASSEENONTVLIVE.TV |
| ASSEENONTV.TIPS | ASSEENONTVMD.COM |
| ASSEENONTV.ZONE | ASSEENONTVO.COM |
| 0ASSEENONTV.COM | ASSEENONTVPHONECARDS.COM |
| 1-800SEENONTV.COM | ASSEENONTVSHOPPINGCHANNEL.COM |
| 1800ASSEENONTV.COM | ASSEENONV.COM |
| 1800ASSEENONTV.ME | ASSEENONVT.COM |
| 2ASSEENONTV.NET | ASSEENONYV.COM |
| 866-ASSEENONTV.COM | ASSEENONZTV.COM |
| 866-ASSEENONTV.NET | ASSEENOTNV.COM |
| 866ASSEENONTV.COM | ASSEENOTTV.COM |
| 866ASSEENONTV.NET | ASSEENOTVWHOLESALE.COM |
| AS-SEEN-ON-TV-OFFERS.COM | ASSEEONNTV.COM |
| AS-SEENONTV.COM | ASSEESONTV.COM |
| ASAEENONTV.COM | ASSESENONTV.COM |
| ASASEENONTV.COM | ASSHEENONTV.COM |
| ASCEENONTV.COM | ATSEENONTV.COM |
| ASEEENONTV.COM | EENONTV.NET |
| ASEENONTV.CO | ISSEENONTV.COM |
| ASEENONTV.INFO | MASSEENONTV.COM |
| ASEENONTV.ORG | NAPKINMILLIONAIRESYSTEM.COM |
| ASSEENANTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.COM |
| ASSEENIONTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.NET |
| ASSEENONATV.COM | OFFICIALASSEENONTVDIRECT.COM |
| ASSEENONITV.COM | OFFICIALASSEENONTVDIRECT.NET |
| ASSEENONT-V.COM | OFFICIALASSEENONTVDIRECTSCAM.COM |
| ASSEENONTB.COM | OFFICIALASSEENONTVDIRECTSCAM.NET |
| ASSEENONTCV.COM | POWERED-BY-ASSEENONTV.COM |
| ASSEENONTOV.COM | POWERED-BY-ASSEENONTV.INFO |
| ASSEENONTV-ADULTS.COM | POWERED-BY-ASSEENONTV.NET |
| ASSEENONTV-ADULTS.NET | POWERED-BY-SEENONTV.COM |
| ASSEENONTV-ADULTS.US | POWERED-BY-SEENONTV.INFO |
| ASSEENONTV-DEALS.COM | POWERED-BY-SEENONTV.NET |
| ASSEENONTV-DIRECT.COM | POWEREDBYASSEENONTV.COM |
| ASSEENONTV-DIRECT.NET | POWEREDBYASSEENONTV.INFO |
| ASSEENONTV-GUY.COM | POWEREDBYASSEENONTV.NET |
| ASSEENONTV-GUYS.COM | POWEREDBYSEENONTV.COM |
| ASSEENONTV-INC.COM | POWEREDBYSEENONTV.INFO |
| ASSEENONTV-INC.NET | SEEENONTV.COM |

| | |
|---|---|
| ASSEENONTV-INFO.COM | SEENONTV-INC.COM |
| ASSEENONTV-KIDS.COM | SEENONTVGUYS.COM |
| ASSEENONTV-KIDS.NET | SEENONTVPC.INFO |
| ASSEENONTV-KIDS.US | SEENONTVSUPERSTORE.COM |
| ASSEENONTV-OFFERS.INFO | SEENONTVWHOLESALER.COM |
| ASSEENONTV-OFFERS.NET | SENNONTV.COM |
| ASSEENONTV-OFFERS.ORG | SENONTV.COM |
| ASSEENONTV-PC.COM | SSEENONTV.COM |
| ASSEENONTV-WHOLESALER.COM | THEASEENONTVDIRECT.COM |
| ASSEENONTV1.NET | THEASEENONTVDIRECT.NET |
| ASSEENONTVADULT.TV | THEASEENONTVDIRECTRIPOFF.COM |
| ASSEENONTVADULTS.COM | THEASEENONTVDIRECTRIPOFF.NET |
| ASSEENONTVADULTS.NET | THEASSEENONTVDIRECT.COM |
| ASSEENONTVADULTS.TV | THEASSEENONTVDIRECT.NET |
| ASSEENONTVADULTS.US | THEASSEENONTVDIRECTSCAM.COM |
| ASSEENONTVAMBASSADOR.COM | THEASSEENONTVDIRECTSCAM.NET |
| ASSEENONTVCALLINGCARDS.COM | THEOFFICIALASSEENONTV.CO.UK |
| ASSEENONTVDEAL.COM | THEOFFICIALASSEENONTV.COM |
| ASSEENONTVDIRECTSCAM.COM | THEOFFICIALASSEENONTVDIRECT.COM |
| ASSEENONTVDIRECTSCAM.NET | THEOFFICIALASSEENONTVDIRECT.NET |
| ASSEENONTVE.COM | TVGOODSINC.CO |
| ASSEENONTVGOODS.COM | TVGOODSINC.COM |
| ASSEENONTVGOODS.NET | TVGOODSINC.NET |
| ASSEENONTVINFO.COM | USEENONTV.COM |
| ASSEENONTVKIDS.NET | USSEENONTV.COM |
| ASSEENONTVKIDS.TV | WWWSEENONTV.COM |
| | YOUWILLNOTBESEENONTV.COM |

## 2. Trademarks

- ASSEENONTV.COM



-

- 1 (866) ASSEENONTV

## 3. Phone Number

The phone number (866) 277-3366.

## RELEASE OF SECURITY INTEREST AGREEMENT

This Release of Security Interest Agreement (this "Agreement") is made and entered into as of the 28th day of October, 2014, by and between AS SEEN ON TV, INC.,  Florida corporation ("ASTV") and VICIS CAPITAL MASTER FUND, a sub-trust of the Vicis Capital Master Series Trust, a unit trust organized and existing under the laws of the Cayman Islands ("Vicis").

### WITNESSETH:

WHEREAS, Infusion Brands International, Inc. ("INBI") and Vicis are among the parties to that certain Securities Purchase, Exchange and Redemption Agreement dated as of March 6, 2014 (the "SPA"); and

WHEREAS, pursuant to the SPA, INBI issued to Vicis that certain Senior Secured Debenture dated as of March 6, 2014 (the "Note"); and

WHEREAS, to secure all present and future indebtedness, obligations and liabilities of INBI to Vicis (including, without limitation, under the SPA and the Note), pursuant to that certain Third Amended and Restated Security Agreement dated as of March 6, 2014, by and between INBI and Vicis (the "Security Agreement"), INBI granted to Vicis a security interest in, inter alia, all of its right, title and interest in and to it assets;

WHEREAS, INBI's obligations under the SPA, the Note and the Security Agreement were subsequently contributed to and assumed by Infusion Brands, Inc. ("IBI"), a wholly-owned subsidiary of INBI, with IBI then being acquired by As Seen on TV, Inc. ("ASTV") on or about April 1, 2014;

WHEREAS, pursuant to an action of the Board of Directors on June 26, 2014, ASTV assumed the obligations of IBI under the SPA, the Note and the Security Agreement; and

WHEREAS, ASTV is the owner, directly or indirectly, of the tangible and intangible property listed on Schedule A hereto (all of which will hereafter collectively be referred to as the "Collateral"); and

WHEREAS, ASTV is a party to that certain Asset Purchase Agreement, dated of even date herewith, by and between Telebrands Corp. ("Telebrands") and ASTV (the "APA"), pursuant to which Telebrands will acquire from ASTV the Collateral; and

WHEREAS, in order to effectuate such a sale, the APA requires, and ASTV wishes to obtain from Vicis, a release of all of Vicis' rights, claims or interests of any sort, including any security interests, whether now existing or in the future, in or against any of the Collateral (the "Claims").

NOW, THEREFORE, for and in consideration of the foregoing, the mutual benefits to be received by the parties hereto, and the covenants and agreements contained herein, ASTV and Vicis agree to the following:

1. Release of Creditor's Security Interests. In consideration of the increased liquidity provided to ASTV by the proceeds to be received from the APA, which Vicis acknowledges is for a full, fair and valuable consideration to ASTV, and which liquidity may be instrumental in ASTV's ability to service and ultimately repay its obligations to Vicis, Vicis hereby (a) releases and terminates its security interests in and liens upon the Collateral, (b) forever releases and discharges the Claims, regardless of (i) when its interest became perfected, (ii) when or how the Collateral was purchased, (iii) the value of the Collateral, (iv) the consideration given or promised therefore, or (v) the amount Vicis is owed by the ASTV, and (c) authorizes ASTV or Telebrands to prepare and file any and all UCC financing statement amendments with respect to all UCC financing statements naming Vicis, as secured party, and ASTV, as debtor, that are currently filed of record in order to effectuate the release by Vicis of its security interests and liens upon the Collateral.

Vicis further (i) waives the obligations of ASTV with respect to the Collateral under the SPA; (ii) waives any Event of Default (as defined in the SPA, the Note and the Security Agreement) that would otherwise exist with respect to the sale of the Collateral, including without limitation as provided in Section 4 of the Note; and (iii) agrees to amend from this date forward the definition of "Collateral" as used in Section 1.2 of the Security Agreement to exclude the Collateral (as defined herein)

2. Reliance by ASTV; Specific Performance. This Agreement is an irrevocable release of any and all Claims to the Collateral, and Vicis acknowledges that ASTV and Telebrands will rely upon the agreements of Vicis herein as the basis for ASTV to provide certain representations, warranties and indemnifications to Telebrands in the APA. As such, damages will not be an effective remedy in the event of a breach of this Agreement by Vicis, and the parties therefore consent and agree to specific performance as the only effective remedy.

3. Amendment. This Agreement may not be amended except by written agreement executed by both ASTV and Vicis.

4. Captions. Captions as used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.

5. **GOVERNING LAW; JURY WAIVER. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA. THE PARTIES HERETO AGREE THAT PINELLAS COUNTY, FLORIDA WILL BE THE EXCLUSIVE VENUE FOR LITIGATION OF ANY DISPUTE OR CLAIM ARISING UNDER OR RELATED TO THIS AGREEMENT. THE PARTIES HERETO WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

6. Successors and Assigns. Unless otherwise herein provided, this Agreement shall be binding upon and inure to the benefit of all successors and assigns.

7. Entire Agreement. This Agreement constitutes the complete and integrated agreement of both ASTV and Vicis with respect to the subject matter hereof, supersedes all prior or contemporaneous oral agreements, discussions or negotiations, and may not be orally modified or supplemented.

8. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which constitute but one agreement. Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date first above written.

AS SEEN ON TV, INC.

By: _____
Printed Name: Robert DeCecco
Title: Chief Executive Officer

VICIS CAPITAL MASTER FUND

By: Vicis Capital, LLC, as Investment Manager

By: _____
Printed Name: Keith W. Hughes
Title: CFO

Exhibit A

Collateral

## 1. Domain Names

| ASSEENONTV.COM | |
|---|---|
| ASSEENONTV.COFFEE | ASSEENONTVKIDS.US |
| ASSEENONTV.EQUIPMENT | ASSEENONTVLIVE.NET |
| ASSEENONTV.HOUSE | ASSEENONTVLIVE.TV |
| ASSEENONTV.TIPS | ASSEENONTVMD.COM |
| ASSEENONTV.ZONE | ASSEENONTVO.COM |
| 0ASSEENONTV.COM | ASSEENONTVPHONECARDS.COM |
| 1-800SEENONTV.COM | ASSEENONTVSHOPPINGCHANNEL.COM |
| 1800ASSEENONTV.COM | ASSEENONV.COM |
| 1800ASSEENONTV.ME | ASSEENONVT.COM |
| 2ASSEENONTV.NET | ASSEENONYV.COM |
| 866-ASSEENONTV.COM | ASSEENONZTV.COM |
| 866-ASSEENONTV.NET | ASSEENOTNV.COM |
| 866ASSEENONTV.COM | ASSEENOTTV.COM |
| 866ASSEENONTV.NET | ASSEENOTVWHOLESALE.COM |
| AS-SEEN-ON-TV-OFFERS.COM | ASSEEONNTV.COM |
| AS-SEENONTV.COM | ASSEESONTV.COM |
| ASAEENONTV.COM | ASSESENONTV.COM |
| ASASEENONTV.COM | ASSHEENONTV.COM |
| ASCEENONTV.COM | ATSEENONTV.COM |
| ASEEENONTV.COM | EENONTV.NET |
| ASEENONTV.CO | ISSEENONTV.COM |
| ASEENONTV.INFO | MASSEENONTV.COM |
| ASEENONTV.ORG | NAPKINMILLIONAIRESYSTEM.COM |
| ASSEENANTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.COM |
| ASSEENIONTV.COM | OFFICIALASEENONTVDIRECTRIPOFF.NET |
| ASSEENONATV.COM | OFFICIALASSEENONTVDIRECT.COM |
| ASSEENONITV.COM | OFFICIALASSEENONTVDIRECT.NET |
| ASSEENONT-V.COM | OFFICIALASSEENONTVDIRECTSCAM.COM |
| ASSEENONTB.COM | OFFICIALASSEENONTVDIRECTSCAM.NET |
| ASSEENONTCV.COM | POWERED-BY-ASSEENONTV.COM |
| ASSEENONTOV.COM | POWERED-BY-ASSEENONTV.INFO |
| ASSEENONTV-ADULTS.COM | POWERED-BY-ASSEENONTV.NET |
| ASSEENONTV-ADULTS.NET | POWERED-BY-SEENONTV.COM |
| ASSEENONTV-ADULTS.US | POWERED-BY-SEENONTV.INFO |
| ASSEENONTV-DEALS.COM | POWERED-BY-SEENONTV.NET |
| ASSEENONTV-DIRECT.COM | POWEREDBYASSEENONTV.COM |
| ASSEENONTV-DIRECT.NET | POWEREDBYASSEENONTV.INFO |
| ASSEENONTV-GUY.COM | POWEREDBYASSEENONTV.NET |
| ASSEENONTV-GUYS.COM | POWEREDBYSEENONTV.COM |
| ASSEENONTV-INC.COM | POWEREDBYSEENONTV.INFO |
| ASSEENONTV-INC.NET | SEEENONTV.COM |

| | |
|---|---|
| ASSEENONTV-INFO.COM | SEENONTV-INC.COM |
| ASSEENONTV-KIDS.COM | SEENONTVGUYS.COM |
| ASSEENONTV-KIDS.NET | SEENONTVPC.INFO |
| ASSEENONTV-KIDS.US | SEENONTVSUPERSTORE.COM |
| ASSEENONTV-OFFERS.INFO | SEENONTVWHOLESALER.COM |
| ASSEENONTV-OFFERS.NET | SENNONTV.COM |
| ASSEENONTV-OFFERS.ORG | SENONTV.COM |
| ASSEENONTV-PC.COM | SSEENONTV.COM |
| ASSEENONTV-WHOLESALER.COM | THEASEENONTVDIRECT.COM |
| ASSEENONTV1.NET | THEASEENONTVDIRECT.NET |
| ASSEENONTVADULT.TV | THEASEENONTVDIRECTRIPOFF.COM |
| ASSEENONTVADULTS.COM | THEASEENONTVDIRECTRIPOFF.NET |
| ASSEENONTVADULTS.NET | THEASSEENONTVDIRECT.COM |
| ASSEENONTVADULTS.TV | THEASSEENONTVDIRECT.NET |
| ASSEENONTVADULTS.US | THEASSEENONTVDIRECTSCAM.COM |
| ASSEENONTVAMBASSADOR.COM | THEASSEENONTVDIRECTSCAM.NET |
| ASSEENONTVCALLINGCARDS.COM | THEOFFICIALASSEENONTV.CO.UK |
| ASSEENONTVDEAL.COM | THEOFFICIALASSEENONTV.COM |
| ASSEENONTVDIRECTSCAM.COM | THEOFFICIALASSEENONTVDIRECT.COM |
| ASSEENONTVDIRECTSCAM.NET | THEOFFICIALASSEENONTVDIRECT.NET |
| ASSEENONTVE.COM | TVGOODSINC.CO |
| ASSEENONTVGOODS.COM | TVGOODSINC.COM |
| ASSEENONTVGOODS.NET | TVGOODSINC.NET |
| ASSEENONTVINFO.COM | USEENONTV.COM |
| ASSEENONTVKIDS.NET | USSEENONTV.COM |
| ASSEENONTVKIDS.TV | WWWSEENONTV.COM |
| | YOUWILLNOTBESEENONTV.COM |

## 2. Trademarks

- ASSEENONTV.COM



- 

- 1 (866) ASSEENONTV

## 3. Phone Number

The phone number (866) 277-3366.

# DELIVERYAGENT

300 California Street, Third Floor
San Francisco, CA 94104
t 415.248.0082
f 415.358.8033
DeliveryAgent.com

16 October 2014

Bob DeCecco, Chairman and CEO
TV Goods, Inc.
14375 Myerlake Cir,
Clearwater, FL 33760

Bala Iyer, Executive Vice President
Telebrands Corp.
79 Two Bridges Road
Fairfield, NJ 07004

         RE:   Right of First Refusal                    Via Email

Dear Bob and Bala:

         We have been informed that TV Goods, Inc. ("TV Goods") has received an offer
from Telebrands Corp. ("Telebrands") to acquire, among other things, the
AsSeenOnTV.com domain name (the "Domain Name"). Pursuant to Section 19 of the E-
Commerce Joint Venture Partnership with TV Goods Term Sheet dated May 27, 2011,
between Delivery Agent, Inc. ("DA") and TV Goods ("Agreement") a copy of which is
attached hereto as Exhibit A, DA has fifteen (15) calendar days from receipt of
notification from TV Goods to inform TV Goods of its decision to either 1) exercise its
right of first refusal and acquire the Domain Name and the related business on the same
terms and conditions set forth in the offer or 2) decline to exercise its right of first refusal.

         By this letter, DA hereby waives its right of first refusal triggered by the proposed
purchase of the Domain Name by Telebrands as provided by Section 19 to the
Agreement. This waiver is conditioned upon Telebrands' execution of an Assignment
and Assumption Agreement substantially in the form attached here to as Exhibit B. For
purposes of clarity, the term in the Agreement extends through August 1, 2017. If you
are in agreement with the language proposed above, please execute as set forth below. If
you do not agree, please notify us as soon as possible and DA reserves its rights under

DELIVERY**AGENT**

300 California Street, Third Floor
San Francisco, CA 94104
t 415.248.0082
f 415.358.8033
DeliveryAgent.com

Section 19 of the Agreement until it receives signed acknowledgement that Telebrands
has executed an Assignment and Assumption Agreement as described above.  Thank you.

Sincerely,

Mike Fitzsimmons
CEO

**AGREED AND ACCEPTED:**

**Telebrands, Inc.**

By: _____
Name: Bala Iyer
Date: 10/28/2014 .

**TV Goods, Inc.**

By: _____
Name: Bob DeCecco
Date: 10/28/14

# DELIVERY**AGENT**

300 California Street, Third Floor
San Francisco, CA 94104
t 415.248.0082
f 415.358.8033
DeliveryAgent.com

**Exhibit A**

05/27/2011 19:18 FAX  8137391919          LEWIS BRISBOIS BISGAARD                    @002/005

# DELIVERYAGENT

# E-Commerce
# Joint Venture Partnership With



## 5/27/2011

05/27/2011 15:18 FAX  8137391919     LEWIS BRISBOIS BISGAARD                    ☑003/005

## DELIVERY**AGENT**



## ASOTV DEAL TERMS PROPOSAL

**Overview**

1. The purpose of this commercial term sheet ("Term Sheet") is to summarize a proposed agreement between TV, Goods,Inc ("the Company") and Delivery Agent, Inc. ("DA"). The parties hereto acknowledge the existence of that certain Delivery Agent Commerce Platform Agreement dated October 15, 2010, between DA and Seen On TV, LLC, and agree that said agreement shall be modified to conform to the terms of this term sheet and the Binding Letter Agreement between the parties hereto and Mary Beth Fasano. The parties shall work in good faith to effect the necessary amendments in conjunction with the finalization of the definitive agreements contemplated by the parties.

2. The overall goal of an agreement between the Company and DA (collectively, the "Parties") would be for DA to provide multi-channel e-commerce services, including technology, interactive marketing, merchandising, fulfillment and customer care services in support of the Company's global online retail operations to support the As Seen On TV brand (www.asseenontv.com).

3. The terms set forth in this Term Sheet are binding upon the Company and DA. Company and DA hereby agreed to negotiate in good faith the terms of the agreement which are not specifically set forth in this Term Sheet prior to execution of the agreement, provided that the terms of this Term Sheet shall remain in full force and effect and shall be fully binding upon the parties hereto and shall supersede all previous documents and negotiations until such time as Company and DA execute the agreement. If the Company and DA are not able to negotiate an agreement, the provisions of this Term Sheet shall remain binding on DA, the Company, Seen on TV, LLC and Mary Beth Fasano.



The term of the agreement shall commence on 8/1/11 and would terminate 120 months following on 5/31/21.



DA will offer a turnkey solution and capabilities to support multi channel e-commerce operations for the Company's online retail offering in North America (and internationally if so desired). It is mutually agreed that DA will implement the operation in English and will offer products in the currency of US Dollars.

All technology and services outlined below will be offered at no additional fee to the Company.

1. **Technology:** DA to make available all aspects of a proprietary multi-tenant commerce platform and transaction processing engine and to handle all day to day hosting and site management. During the term of the agreement, it is understood that any modifications, improvements or updates to the DA commerce platform will be made available to the Company e-commerce operation.

**[image bar]**

2. **Merchandising:** DA will handle all aspects of sourcing, buying, ad sales COD offers and merchandise planning. Company will use best efforts to develop exclusive products for the site and evangelize the site to other infomercial product marketers in an attempt to help increase vendor participation on the site.

## DELIVERY**AGENT**



3. **Marketing:** DA's interactive marketing agency to provide marketing services to maximize the promotional efforts of the Company online storefront including email, SEM, SEO, online display, social networking and affiliate marketing.

4. **Company Marketing:** Company to make commercially reasonable efforts to promote the www.asseenontv.com site through direct response TV advertising. It is understood that additional development work (micro-sites) might be required to support these efforts and that the Company can make no guarantees as to the volume or frequency of these promotions.

5. **Creative Design and User Experience:** DA's leading creative design and development team will produce a fully branded interactive ecommerce shopping experience and micro sites for Company's online retail store.  Company will have full approval of site look and feel.  DA will also provide all creative services necessary to support the interactive marketing strategy, executing all promotional elements for contextual placement, email campaigns, social media outreach and print catalog if necessary.



6. **Store Management** DA will assign a team of category specialists to manage the online retail operation.  This team will be comprised of highly skilled project development, account management, merchandising, product development, site coordination and online marketing talent.  DA and the Company agree to meet regularly during the term of this agreement to review business performance and define quarterly and annual goals and corresponding strategy.

7. **Warehousing & Fulfillment:** DA will receive, store and ship all products in accordance with agreed upon service level agreements to be articulated in the long form agreement. Warehousing and fulfillment will be localized for North America and Europe (if necessary). Warehouse and fulfillment services in North America will be operated out of Martinsville, VA or Burlington, VT.

8. **Customer Service:** DA shall handle all aspects of customer service support to include online self service, inbound phone and inbound e-mail. These services will be managed out of our San Francisco, CA, Burlington, VT and Brunswick, Georgia facilities.

9. **Reporting & Analytics:** Company will have real time access to all sales and performance data through a password protected online reporting system. This access will include all aspects of e-commerce conversion, traffic and global merchandising reports.



10. **Revenue Share:** DA will provide all technology, merchandising, creative services, marketing, store management, fulfillment and customer services outlined here within and will be merchant of record for all transactions processed. Company shall receive revenue share based upon net product and advertising sales. Net product sales defined as total sales of products, ad sales and OOD offers through e-commerce website, catalog and toll free number less fraud and

05/27/2011 19:20 FAX  8137391918       LEWIS BRISBOIS BISGAARD                 @005/005

# DELIVERY**A**GENT

returns. For Net product sales up to $10mm, Company revenue share shall be 7.5%. For net product sales >$10mm, Company revenue share shall be 4.0%.

11. **Wholesale Orders:** For Company products sold through the store accompanied by on air direct response TV media investments, it is understood that the parties shall agree to a wholesale pricing strategy that enables Company to maintain reasonable ROI. It is also understood that the Revenue Share as outlined in #10 will not be applicable for these products and that effective margin for DA on these transactions will not be below 10%.

12. **Custom Production:** It is understood that any custom production for video content to support the sale of products will be reimbursed through revenue share on resulting sales.

13. **Minimum Guarantee:** For the initial seven month period, commencing 6/1/11 and ending 12/31/11 DA shall guarantee minimum annual revenue share payments to ensure that total revenue share paid since inception to incumbent owner equals $500,000 USD. Commencing on 1/1/12 and for the remainder of the term the Company shall guarantee $350,000 USD for each successive annual period. Subsequent annual terms shall commence and terminate on calendar year schedule commencing on 1st calendar day of each year. All revenue share payments shall be made quarterly.



14. **Early Termination Right:** DA may terminate this agreement at any time with 8 months written notice.

**General Terms**

By: _____          By: _____
Mike Fitzsimmons                      Kevin Harrington
CEO                                   President
Delivery Agent, Inc.                  TV Goods, Inc.
                                      as Attorney in fact

# DELIVERYAGENT

11. **Wholesale Orders:** For Company products sold through the store accompanied by on air direct response TV media investments, it is understood that the parties shall agree to a wholesale pricing strategy that enables Company to maintain reasonable ROI. It is also understood that the Revenue Share as outlined in #10 will not be applicable for these products and that effective margin for DA on these transactions will not be below 10%.

12. **Custom Production:** It is understood that any custom production for video content to support the sale of products will be reimbursed through revenue share on resulting sales.

13. **Minimum Guarantee:** For the initial seven month period, commencing 6/1/11 and ending 12/31/11 DA shall guarantee minimum annual revenue share payments to ensure that total revenue share paid since inception to incumbent owner equals $500,000 USD. Commencing on 1/1/12 and for the remainder of the term the Company shall guarantee $350,000 USD for each successive annual period. Subsequent annual terms shall commence and terminate on calendar year schedule commencing on 1st calendar day of each year. All revenue share payments shall be made quarterly.

**F.        Other**

14. **Early Termination Right:** DA may terminate this agreement at any time with 6 months written notice.

**General Terms**

Miscellaneous: Other customary or reasonable terms and conditions including appropriate grants of licenses, audit rights, representations and warranties, reporting, press releases, insurance, indemnification, limitation of liability, termination, assignment, governing law, reporting, and other contractual provisions would be mutually agreed upon by the Parties and be described within a Definitive Agreement.

Statement of Confidentiality: The Parties agree that the information in this Term Sheet is confidential in nature and agree not to disclose to any person, (excluding directors, employees and Company advisors and representatives) on a need-to-know basis, any of the terms or conditions of this term sheet or any discussions or negotiations with respect to this transaction, or any information furnished in connection with this proposed transaction, without the consent of the other Party.

By: _____          By: _____
    Mika Fitzsimmons                     President
    CEO                                  TV Goods, Inc.
    Delivery Agent, Inc.

AGREED AND CONSENTED TO:

Sean On TV, LLC

By: _____
    Mary Beth Faseno
    CEO



Safari File Edit View History Bookmarks Window Help
Fri 3:32 PM
Show Stoppers | The Official AsSeenOnTV.com™ Shop
https://www.asseenontv.com/detail.php?p=365354&SESSID=fb6fe94e32a8631caaacc774ea43dee6
Google
Show Stopper
Price: $7.95
Qty: 1
update | remove
Are you a returning customer? Sign In »
New Customers (*) indicates required field
Shipping Information
First Name:*
Last Name:*
Company:
Address 1:*
Address 2:
City:*
State:* Alabama
Country:* United States
Zip/Postal Code:*
Day Phone:*
Email:*
Use shipping address as my billing address
Shipping Method: 3-7 business days $6.95
Estimated shipping costs are based on shipping within the continental US.
Payment Information
Credit Card Type:* --Select Card Type--
Name on card:*
Card Number:*
Expiration Date:* -Month- -Year-
Security Code:* (what's this?)
Do you have a promo code? promotional code apply
Order Subtotal: $7.95
Estimated Shipping: $6.95
Order Total: $14.90
Express Processing Just add $6 - move to the front of the order processing line!

## AMENDMENT TO E-COMMERCE JOINT VENTURE PARTNERSHIP
## WITH TV GOODS TERM SHEET

This Amendment to the E-Commerce Joint Venture Partnership with TV Goods Term Sheet is entered into by and between TV Goods, Inc. ("TV Goods") and Delivery Agent, Inc. ("DA") effectives as of this the 19th day of July 2011 ("Effective Date").

WHEREAS, TV Goods and DA entered into that certain Commerce Joint Venture Partnership with TV Goods Term Sheet dated May 27, 2011 ("Agreement");

WHEREAS, the parties desire to revise the terms and conditions of the Agreement;

NOW, THEREFORE, in consideration of the mutual promises of the parties, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.  Notwithstanding anything to the contrary set forth in the Agreement, the parties agree to the following additional services.

    A.  DA shall build, host and manage a micro site ("Site") to support TV Goods e-commerce efforts, including direct marketing and promotional efforts, for the TBD Heater Product ("Product").  The Site will consist of no more than four to six (4-6) unique pages, including a checkout page.

    B.  DA will design the Site based on existing marketing assets (copy, images, video collectively referred to as the "Assets").  TV Goods will make available all related creative assets and the schedule of media flights and other marketing promotions related to this product. TVG shall grant DA the rights to use all of the intellectual property rights it currently possesses in the Product for the Term of the Agreement but only for the purposes of accomplishing the goals of the Agreement. The parties shall agree on a time table for the delivery of the Assets and a date for the launch of the Site. Any delay in the delivery of Assets to DA shall delay the launch of the site in an amount of time equivalent to the time period of the delay of the delivery of the Assets.

    All transactions shall be processed utilizing TV Goods Inc merchant account.

    C.  TV Goods will handle all aspects of warehousing and fulfillment for the Product.

    D.  TV Goods will pay for all pre approved marketing costs related to digital marketing campaigns for the Product.

    E.  Any sales of the Product through AsSeenOnTV.com shall be excluded from the commission calculation set forth below.

    F.  Compensation

(i)    Upfront Development Fees:      $750

(ii)   Commissions to DA
       DA shall be paid commission on the sale of the Product via the Site as set forth in
       the table below.

### Table 1:  Commission Schedule
### MONTHLY REVENUE VOLUME

| IDR Commissions | 0-2999 | 3000-14999 | 150000+ |
|---|---|---|---|
| SEO/CPA | .25 | .25 | .25 |
| CPA/Affiliate/SEM-PPC | $    1.50 | $    1.25 | $    0.50 |
| Direct | .25 | .25 | $    0.25 |
| Upsells | $    0.75 | $    0.50 | $    0.25 |
| Accelerated Shipping | $     0 | $     0 | 0 |

2.  The remainder of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the products hereto have entered into this Amendment to the E-
Commerce Joint Venture Partnership with TV Goods Term Sheet as of the Effective Date, and
this Amendment has been executed by duly authorized officers of each party hereto.

**TV GOODS, INC.**                          **DELIVERY AGENT, INC.**

By: _____        By: _____
      Steve Rogai            Mike Fitzsimmons
      CEO                    CEO

## AMENDMENT TO E-COMMERCE JOINT VENTURE PARTNERSHIP
## WITH TVGOODS TERM SHEET

This Amendment to the E-Commerce Joint Venture Partnership with TV Goods, Inc. Term Sheet ("Amendment No. 2") is entered into by and between TVGoods, Inc. ("TV Goods" or "TVG") and Delivery Agent, Inc. ("DA") shall be effective as of this the 27th day of August 2012 (the "Effective Date").

WHEREAS, TV Goods and DA entered into that certain Amendment to E-Commerce Joint Venture Partnership with TV Goods, Inc. Term Sheet dated July 19, 2011 ("Amendment No.1"); and

WHEREAS, TV Goods and DA entered into that certain E-Commerce Joint Venture Partnership with TV Goods, Inc. Term Sheet dated May 27, 2011 ("Agreement"); and

WHEREAS, the parties desire to revise the terms and conditions of the Agreement as amended.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

I.    If there is a conflict between the terms of the Agreement as amended and this Amendment No. 2, the terms of this Amendment No. 2 will control. The parties agree that TV Goods shall provide the following:

        a. TV Goods shall invest $250,000 into a media budget, the money in the budget will be used to fund a 30-60 second video production (the "Spot") showcasing Kevin Harrington as the Chairman of As Seen On TV, Inc. The Spot will drive consumers to www.asseenontv.com (the "Site") and promote a contest for inventors to submit their product to win a prize all in the effort to create maximum exposure. TV Goods will use money from the aforementioned budget to fund a national media campaign for the Spot.

        b. TV Goods has hired a social media firm to maximize the efforts of Kevin Harrington and As Seen on TV, Inc. to drive traffic to the Site. To date TVG has spent six-thousand ($6,000) dollars on said social media firm.

        c. TV Goods has increased the marketing spend to thirteen-thousand and five-hundred ($13,500) dollars per month to include securing Kevin as the regular

"Ambassador of As Seen on TV." The increased marketing spend may provide exposure on "The View," "Wendy Williams" and other talk shows to showcase the Site when applicable and its products.

d. TV Goods shall contribute the capital needed, the amount of which will be mutually agreed upon by both parties to revamp the Site so that it can also be used as the corporate site for the public company, As Seen On TV, Inc., and include an investor section.

e. TV Goods shall contribute the capital needed, the amount of which will be mutually agreed upon by both parties to revamp and/or add elements to the Site to create more of a social experience for the customer base.

f. TV Goods shall manage and fund the costs of driving ad revenue sales and shall split any profits on a 75%/25% percent basis to TV Goods and DA respectively. TV Goods shall fund and manage all of these operations. TV Goods has re-engaged a full time executive level employee to manage the relationship between both entities. This employee is an experienced and seasoned veteran in the e-commerce marketplace.

g. TV Goods shall make DA aware of all opportunities that TV Goods reasonably believes may benefit the Site. DA shall be under no duty to compensate TV Goods for said referrals. The parties recognize that they have already been in discussion regarding "AAFES," an "ASTV" gift card, and other co-branding opportunities.

h. TV Goods shall ensure through "opt-in" that all mailing and customer lists that are generated through its seminars and other sources are added to DA's mailing list for use in conjunction with the Site.

i. TV Goods shall use best efforts to bring celebrity presences to the site to share on their social accounts to create exposure. TV Goods is currently working on five (5) celebrity backed products that can be sold on the site and capitalize on their fan bases to drive traffic.

ll.    Clarification to Term. To update the Agreement regarding the Term, the Agreement is hereby amended and restated as follows:

The term of the Agreement shall commence on the Effective Date and will terminate on 8/1/17.

III.     Clarification to Technology. To update the Agreement regarding Technology, Section 1:
        "Technology" is hereby amended and restated in its entirety as follows:

> 1.      **Technology**: DA shall make available all aspects of a "proprietary multi-
> tenant commerce platform and transaction processing engine" and shall manage
> all day to day hosting and Site management. During the term of the Agreement, it
> is understood that any modifications, improvements or updates to the DA
> commerce platform will be made available to TV Goods' e-commerce operation.
> DA shall complete the shopping cart integration by a date no later than 9/1/12.

IV.     Clarification to Marketing. To update the Agreement regarding Marketing, Section 3:
        "Marketing" is hereby amended and restated in its entirety as follows:

> 3.      **Marketing**: The parties shall mutually agree on a marketing plan for
> SEM and paid online marketing. To that end, DA shall pay $250,000 per year for
> SEM and paid online marketing. If it is the case that the costs for SEM and paid
> online marketing exceed $250,000 during any given year of this Agreement, TVG
> and DA hereby agree to evenly share any costs exceeding $250,000 during that year.
> The parties hereby acknowledge and agree that the equal sharing of the expenses
> associated with SEM and paid online marketing is dependent upon TV Goods
> satisfying its obligation to invest $250,000 per year to fund the Spot and to fund a
> national media campaign for the Spot as those obligations are discussed in section
> I(a) of this Amendment No. 2, and DA satisfying its obligation to pay $250,000
> pursuant to this Section 3 during each year of this Agreement. Additionally if the
> annual costs to fund the Spot and to fund a national media campaign for the Spot
> exceed $250,000 in a given year of this Agreement, DA and TVG shall evenly share
> any costs incurred by TVG in excess of $250,000 for said obligations. In the event
> either party fails to meet its respective obligations, the other party shall not be
> required to perform its commensurate obligation.

V.      Clarification to Revenue Share. To update the Agreement regarding Revenue Share,
        Section 10: "Revenue Share" is hereby amended and restated in its entirety as follows:

> 10.     **Revenue Share:** DA shall provide to TV Goods all technology,
> merchandising, creative services, marketing, store management, fulfillment, and
> customer services outlined herein and will be the merchant of record for all
> transactions processed. TV Goods shall receive a revenue share based upon "Net
> Product Sales." For the purposes of this Agreement "Net Product Sales" shall be
> defined as the total sales of products and OOD offers through the Site, less fraud

and returns. TV Goods' revenue share shall be calculated on the following percentages:

| Total Sales | Revenue Share Percentage |
| --- | --- |
| $0 - $10,000,000 | 8.5% |
| $10,000,000.01 or more | 10.00% |

(i.e. TV Goods shall receive the percentage of the Net Product Sales received by DA). The revenue share thresholds set forth above, shall apply for each calendar year during the Term and shall reset annually on January 1.

VI.    Clarification to Wholesale Orders: To update the Agreement regarding Wholesale Orders, Section 11: "Wholesale Orders" is hereby amended and restated in its entirety as follows:

11.    **Wholesale Orders:** For TVG products sold through the Site accompanied by on air "direct response" TV media investments, it is understood that the parties shall agree to a wholesale pricing strategy that enables TV Goods to maintain reasonable ROI. DA shall cooperate with TV Goods to recognize wholesale revenue of ALL products sold to DA from ALL vendors for use and sale on the Site that are accompanied by on air direct response TV media investments.

VII.    Section 15 is added to the Agreement to read as follows:

15.    **Ownership: Site Content, Customer Data.** During the Term of this Agreement the Parties shall co-own all site content, wireframes and the customer database related to the site. If the parties terminate this agreement, ownership of the site content, wireframes, and the customer database shall become the sole property of TV Goods. DA will make available to TV Goods all site wireframes, all content, and a complete copy of the customer database with all historical transactional data obtained from consumers to the Site upon termination of this Agreement. Such data shall be used in accordance with all applicable laws and regulations. For purposes of this Section 15, "Customer Data" is defined as all information collected by DA from visitors to the Site. Such information shall include, but shall not be limited to, consumer names, addresses, email addresses and such other personally identifiable information as may be provided by or collected from transactions. Additionally, during the Term of this Agreement TVG shall have the right to use all data described above for purposes beyond the scope of this Agreement in accordance with all applicable laws and regulations. For the purposes of clarity only: if at any time during the Term of this Agreement

if TVG desires to use the customer database as a focus group for new products, as a list for a company mail letter, or for any other legitimate business purposes DA shall provide to TV Goods said information. TVG represents and warrants that it shall only use the above information in compliance with all applicable laws and regulations. DA shall provide TV Goods with a copy of the all Customer Data upon request.

VIII.   **The following section shall be added to the Agreement:**

**16.     Audit Rights:** TV Goods shall have the right two (2) times during each year of this Agreement and for one (1) year thereafter, during normal business hours, upon ten (10) days prior written notice to DA and subject to reasonable confidentiality requirements, at TV Goods' expense to review, with an advisor or advisors of its choice, the books and records of DA for the purpose of determining the accuracy of the calculation and payment of royalties or revenue share. In the event that a review determines TV Goods has received less than ninety-five (95%) percent of the commissions, royalties, or revenue share owed to it for the audited period, DA shall reimburse TV Goods for the reasonable costs of the audit in addition to payment of all monies owed with interest at the then current prime lending rate as published in the *Wall Street Journal*, per annum on any overdue amounts.

IX.     Section 13 of the Agreement shall be deleted in its entirety and replaced with the following:

13. **Minimum Guarantee:** Commencing on January 1, 2012 and for the remainder of the term of the Agreement, DA shall pay to TV Goods three-hundred and fifty-thousand ($350,000) dollars every annual period of this Agreement. Annual terms shall commence and terminate on the first calendar day of each calendar year. All revenue share payments shall be made on a quarterly basis, said quarterly payments shall be due on April 1, June 1, September 1, and December 31 of each year of this Agreement. Said quarterly minimum payments shall be in the amount of eighty-seven-thousand and five-hundred ($87,500) dollars every quarter. All amounts due to TV Goods during each quarter over the $87,500 minimum payment shall be paid to TV Goods during the quarter during which they were made, not at the end of the year. In the event the Revenue Share payments do not exceed the Minimum Guarantee in a calendar year. DA shall pay TVG the shortfall between the Minimum Guarantee and Revenue Share payments made. If it is the case that DA is late in its payment of TV Goods' share of the revenue, DA shall make the payment owed with interest calculated at the then current prime lending rate as published in the *Wall Street Journal*, per annum on any overdue amounts. If it is the case that DA does not make the minimum payment each year described herein, TV Goods shall have the option of terminating this Agreement. In the event of termination all rights granted to DA under the terms of this Agreement shall revert back to TV Goods.

X.      Section 14 of the Agreement shall be deleted in its entirety and replaced with the
        following:

> 14. **Termination:** In the case of a breach of this Agreement by either party, the non-
> breaching party shall give written notice (an email with a "read receipt" shall
> constitute "written notice") of said breach to the breaching party. Upon receipt of
> written notice by the breaching party the breaching party shall have thirty (30) days to
> cure said breach. If the breach has not been cured within the thirty day period the
> non-breaching party shall have the right to terminate this Agreement.

XI.     The following section shall be added to the Agreement as amended:

> **17. DA Information:**
>
> a. In addition to the audit rights granted to TV Goods, DA shall, if
>    requested by TV Goods, provide all reasonable information, on
>    an annual basis, required to substantiate any claim made by DA
>    regarding, but not limited to the following:
>
>    i. DA's profit margins; and
>    ii. DA's purchase orders; and
>    iii. DA's wholesale pricing; and
>    iv. DA's overhead costs related to the Site; and
>    v. Any applicable financial statements of DA; and
>    vi. Any applicable profit and loss statements; and
>    vii. Any other information reasonably related to the financial
>         situation of the Site.
>
> b. The parties agree to undertake the following projects during the
>    term of the Agreement, the parties shall mutually agree on the
>    amounts that each shall put forth towards each project, prior to
>    commencing each project DA shall establish and provide to TV
>    Goods budgets for the following projects and any other projects
>    the parties agree to undertake during the term of the Agreement:
>
>    i. "ASTV mobile phone app;" and
>    ii. "ASTV pre-paid calling cards; and
>    iii. ASTV foods.com; and
>    iv. AAFES integration; and
>    v. "paid search programs such as the purchase or bidding
>       of "Keywords" from Internet Search Engines.
>
> c. DA shall employ Todd Davies during the term of this
>    Agreement; provided, that Todd Davies is in good standing with
>    DA. DA shall not be held in breach of this clause in the event

Todd Davies is terminated by DA for cause or other valid business reasons.

d.  Todd Davies shall remain the executive level liaison between TV Goods and DA for so long as TV Goods desires for Mr. Davies to act in that capacity, provided that he is employed by DA.

XII.    The following section shall added to the Agreement as amended:

18. For a period of two years following the expiration or termination of this Agreement, for whatever reason, DA (individually or in association with, or as a stockholder, director, officer, consultant, employee, partner, joint venturer, member, or otherwise, of or through any person, firm, corporation, partnership, association or other entity) shall not, directly or indirectly, launch a branded web-store, using the logos/marks as referenced in Exhibit A.  Upon expiration or termination of this Agreement, for whatever reason, DA shall return any and all information related to the trade secrets of TVG.

XIII.   The following section shall be added to the Agreement as amended:

During the Term, DA shall have a right of first refusal ("ROFR") on any offer made by another party to acquire AsSeenOnTV.com. Upon receipt of an offer to purchase AsSeenOnTV.com, TVG shall immediately notify DA of such an offer. DA shall have fifteen (15) calendar days from receipt of notification from TVG to inform TVG of its decision to (a) exercise its ROFR and acquire AsSeenOnTV.com or (b) decline to exercise its ROFR. In the event DA elects to exercise its ROFR, the terms and conditions shall be no less favorable to TVG than as presented to DA

XIV.   The "General Terms" Section shall be deleted in its entirety and replaced with the following:

General Terms:

Miscellaneous: Other customary or reasonable terms and conditions including appropriate grants of licenses, representations and warranties, reporting, press releases, insurance, indemnification, limitation of liability, assignment, reporting, and other contractual provisions would be mutually agreed upon by the Parties and described within a definitive agreement.

Statement of Confidentiality: The Parties agree that the information in this Term Sheet is confidential in nature and agree not to disclose to any person (excluding directors, employees and TVG advisors, and representatives all on a need-to-know basis) any of the terms or conditions of this Term Sheet, or any discussions or negotiations with respect to this

transaction, or any information furnished in connection with this proposed transaction, without the consent of the other party.

XV.   The following section shall added to the Agreement as amended:

19. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida applicable to agreements made and to be performed within Florida without regard to Florida's choice of law provisions.  The parties hereto (a) consent to the exclusive jurisdiction and venue of the federal and state courts located in the state of Florida in any action arising out of or relating to this Agreement; (b) waive any objection they might have to jurisdiction or venue of such forums or that the forum is inconvenient; and (c) agree not to bring any such action in any other jurisdiction or venue to which either party might be entitled by domicile or otherwise.

XVI.   **The remainder of the Agreement shall remain in full force and effect however if any part of the Agreement conflicts with the terms of this amendment, as previously stated, the terms of this amendment shall control.**

IN WITNESS WHEREOF, the products hereto have entered into this Amendment to the E-Commerce Joint Venture Partnership with TV Goods Term Sheet as of the Effective Date, and this Amendment has been executed by duly authorized officers of each party hereto.

TV GOODS, INC.                                   DELIVERY AGENT, INC.

By: _____          By: _____
       Steve Rogai                                          Mike Fitzsimmons
       President                                             CEO

Exhibit A





# DELIVERY**AGENT**

300 California Street, Third Floor
San Francisco, CA 94104
t 415.248.0082
f 415.358.8033
DeliveryAgent.com

**Exhibit B**

**EXECUTION COPY**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of October 28, 2014 (the "Effective Date") by and among TELEBRANDS CORP., a New Jersey corporation ("Acquiror"), and TV Goods, Inc., a Florida corporation ("Transferor").

WHEREAS, Transferor is party to that certain E-Commerce Joint Venture Partnership agreement by and between Transferor and Delivery Agent, Inc. ("Delivery Agent"), dated May 27, 2011, as amended as of July 19, 2011 and August 27, 2012 (the "Assumed Agreement");

WHEREAS, Acquiror and Transferor are parties to that certain Asset Purchase Agreement, dated the date hereof (the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the Asset Purchase Agreement, among other things, (i) Transferor has agreed to sell, transfer and assign to Acquiror the Assumed Agreement and all of Transferor's rights thereunder, and (ii) Acquiror has agreed to assume all of Transferor's liabilities and obligations thereunder.

NOW, THEREFORE, in consideration of the premises and the consideration hereinafter set forth, each of Acquiror and Transferor hereby agrees as follows:

1.      Defined Terms. All terms set forth herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

2.      Assignment and Assumption. Transferor hereby sells, transfers and assigns to Acquiror the Assumed Agreement and all of Transferor's rights thereunder, and Acquiror hereby assumes the Assumed Agreement and all of Transferor's liabilities and obligations thereunder, in each case, as specifically set forth in the Asset Purchase Agreement. In addition, Transferor hereby warrants and agrees to defend the assignment of the Assumed Agreement unto Acquiror against the claims and demands of all third parties as set forth in the Asset Purchase Agreement.

3.      Further Assurances. Transferor and Acquiror agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement on a timely basis the transactions contemplated by this Agreement.

4.      Representations and Warranties. Notwithstanding the foregoing, no provision of this Agreement shall in any way modify, replace, amend, change, rescind, waive or in any way affect the express provisions (including the warranties, covenants, agreements, conditions, representations or any of the obligations and indemnifications, and the limitations relating thereto, of Acquiror or Transferor) set forth in the Asset Purchase Agreement, this Agreement being intended solely to effect the transfer of the Assumed Agreement pursuant to the Asset Purchase Agreement.

5.      Parties Bound. This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, legal representatives, successors and assigns as permitted by this Agreement.

6       No Third-party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.      Amendment.  This Agreement may be amended only by a written agreement duly executed by all parties hereto.

8.      Legal Construction.   This Agreement shall be construed as to effectuate the intended purpose of the Agreement. In the event any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, this Agreement shall be modified to otherwise effectuate the sale under the original intentions of the Parties. This may include striking the invalid, illegal, or unenforceable provision as if they had never been contained in this Agreement, or modifying the invalid, illegal or unenforceable provisions to make them compliant without modifying the original purpose of the Parties.

9.      Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon the same instrument.

10.     Applicable Law.  This Agreement shall be construed under and in accordance with the laws of the State of New York, without regard to the conflicts of law rules thereof.

**[Signature Page Follows.]**

2

**IN WITNESS WHEREOF**, each of Acquiror and Transferor has executed and delivered this Agreement on the date first above written:

**ACQUIROR:**

TELEBRANDS CORP.


By:_____
   Name:
   Title:


**TRANSFEROR:**

TV GOODS, INC.


By:_____
   Name:
   Title:

*NY 244767532v5*

# Exhibit B

# Telebrands' ASTV Website

## asseenontv.com



# Exhibit C

# Defendants' New Website

## seenontv.com



# Exhibit D

# Defendants' "Copper Pro Pan" Product Page

## seenontv.com



### Product Description

Professional chefs and kitchen novices alike agree that the quality of your cooking ware matters if you want to consistently turn out delicious meals! There are certain tools of the culinary trade that are simply necessary in all kitchens, and a great non-stick pan is one of them!

The Copper Pro vs an ordinary pan can make all the difference between the PERFECT omelette and a BURNT omelette. That is why you will love our new Copper Frying Pan. Its copper composition contains an amazing ceramic coating that is responsible for keeping your food from sticking! Nothing ever sticks to it – everything just slides right off! Best of all, the ceramic coating is made to last! Featuring an ergonomic handle, this frying pan is easy to grip and makes cooking a joy!

The Copper Pro is 100% Safe, as well as PFOA, PTFE & PFOS Free. It leaves food intact without the use of butter, lard, or oil! All kinds of foods glide off the slick coating of this pan with ease, so there's no need to add unnecessary fats and calories to your meals!

The Copper Pro chef's pan evenly distributes heat so that everything you cook comes out perfectly! Our frying pan can be used both on the stove top and inside of the oven! You can use this pan for frying, baking and cooking! No other generic brand out there has frying pans with so much versatility.

COPPER PRO FEATURES:

* Non-Stick Technology
* Ceramic Coating
* Evenly Distributes Heat
* No Oil or Butter Needed!
* Works on StoveTop and in Oven
* 10" Pan